WILLIAM WAGNER, Appellee, v. MAUDE WAGNER, Appellant, et al., Appellee.

No. 39613.

APRIL 2, 1929.

REHEARING DENIED SEPTEMBER 21, 1929.

*C. S. Cooter,* for appellant.

*Strock, Cunningham, Sloan & Herrick* and *Edward Breen, Jr.,* for appellees.

STEVENS, J.—John Wagner died intestate December 27, 1926, seized of the legal title to a four-acre tract located on Indianola and Evergreen Avenues in Des Moines. He was survived

by his widow, the appellant, and two brothers, Will and George. This action was commenced in January, 1927, by William against the appellant only, to have a trust to an undivided one-third interest impressed upon the above property, and to quiet title thereto. Later, the exact date not being shown, James McElvogue appeared in the action, and filed a petition in intervention, asserting the same interest in the property, and praying the same relief, as the plaintiff. William Wagner died July 4, 1927, and George Wagner, administrator of his estate, was substituted as plaintiff. A trial upon the issues joined resulted in a decree in favor of the plaintiff and the intervener, and the defendant prosecutes this appeal.

The conceded facts, briefly stated, are, in substance, as follows: In 1911, and long prior thereto, Ellen Wagner, the mother of William, John, and George, resided on a small property in the city of Des Moines. Prior to this time, John, who was a paper hanger, and unmarried, lived at home with his mother. William, who was also unmarried, was a marble setter, and had always resided with his mother. The intervener was employed at a local packing house, and, although not related to the Wagners, had been an inmate of their home for many years. During the year 1911, Ellen entered into a contract of purchase for the property in controversy. The consideration was somewhat in excess of $1,700, and was paid, $100 cash, and the balance in monthly installments of $20 each. The payments required by the contract having all been made, the vendor conveyed the property to John. The appellant and John were married in 1923. No issue was born to them, and, as the value of the property does not exceed $7,500, it went, under the statute, to appellant. Ellen Wagner died in 1918, after the deed conveying the property to John was executed. All of the parties named continued thereafter to reside at the Wagner home on the tract in controversy. During the period intervening between the death of Ellen and the marriage of John, the latter did the cooking and maintained the household. The intervener left the premises sometime after the death of John. William also left, at an earlier date. It is also conceded that John was afflicted with bronchial and some other ailments, and that William was addicted to the excessive use of intoxicants. The chief reason assigned for the sale of the prop-

erty originally owned by Ellen Wagner and the purchase of the tract in question was to secure a location that would provide light employment for John and benefit his health.

Appellees predicate their respective claims to an undivided interest in the property upon an alleged oral agreement between Ellen, John, and William Wagner and the intervener, that the contract purchase should run to Ellen, as purchaser; that John would look after and manage the property, and William and intervener pay the purchase price out of their weekly or monthly wages. Full and absolute compliance with this claimed arrangement is alleged by appellees. The reason assigned for placing Ellen's name in the contract as purchaser and John's in the deed as grantee is that William, because of his intemperate habits, could not be trusted with the legal title to any interest in the property. The evidence on both sides is more or less fragmentary, and consists very largely of declarations and admissions made by Ellen and John and relevant conversations and transactions between the parties, more or less uncertain as to the probative value thereof. Many of the conversations and declarations referred to by the witnesses occurred long prior to the date of the trial.

It is claimed by appellees that William and the intervener always gave their pay checks to Ellen Wagner as long as she lived, and thereafter to John. It is also asserted that Ellen purchased the clothing for intervener out of the money turned over to her. The purpose of delivering the pay checks to Ellen, as stated, was to provide the funds necessary to pay the monthly installments on the place. The earnings of the two men amounted to much more than the monthly payments. Many valuable improvements were placed upon the property after the Wagners assumed possession thereof. A new modern house, with kellastone exterior, was erected thereon. At the time of John's death, the property was incumbered by a mortgage of $1,200.

There is a sharp dispute in the testimony as to the extent that John's health disabled him from working at his trade, but that he did work at it to some extent is conceded. The tract was used for gardening and raising fruit. The activities of the place also included chicken raising. John exercised full control over the place, employed the necessary help, cultivated the tract,

marketed the truck and fruit, and, so far as the evidence shows, designed and looked after all of the improvements made.

Numerous witnesses testified that they had seen intervener turn his pay checks over to Ellen Wagner. All of them roomed and boarded at Ellen's. William did not work steadily, but appears to have been industrious, and worked part of the time at the packing house. R. B. Thode, from whom the property was purchased, testified that John paid all of the monthly installments, either in currency or checks received by him for the sale of vegetables and fruit. A grocer to whom John sold vegetables testified that he frequently presented checks drawn payable to intervener. They were used, so far as necessary, to purchase groceries. The intervener testified to the alleged oral understanding or agreement between the parties. His testimony gave the details of the transaction, and corroborates the claims of appellees that he and Will always delivered their pay checks to Ellen or John, to be used in paying for the property. The competency of this witness is challenged by appellant. We will dispose of this challenge later.

The testimony on behalf of appellant tended to show that neither William nor the intervener ever asserted any claim to an interest in the property before this action was commenced; that they paid only for room and board, to both Ellen and John; that the latter exercised full control over the property, managed the business in his own way, incumbered the property by mortgage, and paid the taxes. The evidence shows that he purchased hardware to the extent of $400 at the store, and had it charged to him. The only evidence as to the net annual income from the premises is that it did not exceed from $300 to $350. Intervener earned as much as $28 per week. Both William and the intervener left the premises without having asserted any claim to an interest therein. Appellant has paid the interest on the mortgage and the taxes since her husband's death. The testimony of the intervener is much discredited by that of other witnesses. He admitted that he did not, prior to the commencement of this action, inform appellant that he claimed an interest in the property.

During a portion of the time prior to 1928, when the deed was executed, intervener owned an old automobile. He purchased and paid for gasoline and repairs, when necessary, on the car. F. H. Merrill testified that he operates a gasoline station on

East Sixth Street; that he is acquainted with intervener; and that he cashed the pay checks for him every month from January 24th to October 26th. More significant even than this testimony is that of Paul James, a lawyer in the city of Des Moines. He testified that he was employed by appellant to represent, and make defense for her in this action; that a controversy arose between them, and he withdrew from the case; that, during the time he was representing appellant, intervener came with her to his office, for the purpose of an interview; that, while there, he was asked specifically as to whether he had, or claimed, an interest of any kind in the property; and that he stated that he did not. The response to this testimony by intervener finally was that, if he made such statement, he did not understand the questions. It is conceded that intervener is somewhat deaf, and ordinarily there might be much force in the explanation offered. Called to the stand in his own behalf, intervener stated:

"I do not recollect telling the lawyer that I had no interest in the property. I might have told him that, but I do not recollect. I do not just remember whether I did or not."

The witness James testified that he knew intervener was deaf; that he sat close to him in the office, and was sure that he understood the questions and the answers made thereto. The claim of intervener to an interest in the property is further disputed by one Balderson, who testified that he sought to negotiate the trade of some land he owned in South Dakota to John Wagner for the tract in controversy; that the conversation was had at the Wagner home, in the presence of intervener. This witness testified that, during the conversation, intervener stated that he was in no wise interested in the property. The testimony of this witness is subject to some infirmity.

In the first place, the intervener was incompetent, under Section 11257, Code of 1924, to testify to the alleged oral agreement between the parties. Appellees concede that he was incompetent to testify in his own behalf, but insist that he was competent to testify in behalf of the administrator of William's estate. There is no way by which his testimony can be limited to the facts claimed by William's estate. He is a party to the action, and at all times hostile to appellant. If he was competent

to prove the contract in behalf of William's estate, he proved it for himself, as well. A single decision by this court is relied upon by counsel,—that is, *Hogan v. Sullivan,* 114 Iowa 456. There was neither issue nor controversy between the witness, who was a party to the action, and the defendant in that case. The relief asked by the witness was wholly distinct from the action in which the plaintiff sought to recover of the defendant money in behalf of the estate involved. This is the ground upon which the competency of the witness was upheld and the proper distinction made.

With the testimony of intervener as to the alleged oral contract eliminated, there is insufficient remaining to carry the burden required of appellees. A mere preponderance of the evidence is not sufficient to overcome the presumption arising from the possession of the legal title to the real property. The evidence for that purpose must be clear, convincing, and satisfactory. *Kelley v. Kelley,* 189 Iowa 311; *Ratigan v. Ratigan,* 181 Iowa 860; *Hayes v. Dean,* 182 Iowa 619.

The testimony of declarations and admissions made by Ellen and John Wagner and all conversations overheard between them is not of a high order. It is subject to the fallibility of human memory and judgment. Its accuracy cannot be depended upon. It is true that many of the witnesses were relatives, or intimate friends, and may well be presumed to have had, if not a direct, a sympathetic, interest in the matter. But, even if their testimony be given all of the credit that can possibly be claimed for it, it falls far short of proving the alleged oral understanding, or that the proceeds of the pay checks were used in paying either the purchase price or for the improvements placed upon the land. So far as the record shows, there was no conference or discussion between John and the other parties claimant as to the nature, extent, or character of the improvements that were placed upon the tract. No doubt, whatever sums were paid by Will and McElvogue to Ellen Wagner were used to defray household expenses, perhaps to pay on the purchase price, and to aid in making the improvements. The competent direct testimony does not go that far. It is also significant that both William and intervener left the premises without having asserted some claim to or interest therein. They do not appear to have ever paid the taxes, or interest on the incumbrance. One occasion is shown in which

John asked William for money to pay taxes, and received $45. The several parties lived harmoniously together, and appear to have conducted the business in a careless, slipshod manner. No one appears to have kept track of anything. It may be that the result we reach will work an injustice. No court can know absolutely what is the exact truth of facts so conflicting as in this case. What we hold is that the testimony fails to convincingly and abidingly satisfy our minds that the facts are as claimed by appellees.

The remaining questions raised relate to the sufficiency of the evidence in any event to establish a resulting trust or the admission and performance of an express trust originating in parol. The result arrived at on the facts renders any discussion or decision of these contentions unnecessary. It follows that the judgment and decree of the court below must be, and it is,—*Reversed.*

ALBERT, C. J., and EVANS, DE GRAFF, and MORLING, JJ., concur.